L. M. Graves v. Commissioner.
Graves v. Commissioner
Docket No. 28049.
United States Tax Court
1952 Tax Ct. Memo LEXIS 221; 11 T.C.M. (CCH) 467; T.C.M. (RIA) 52143; May 14, 1952
*221 Robert J. Bird, Esq., and A. B. Raymer, Esq., for the petitioner. Paul E. Waring, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined a deficiency in income and victory tax for the year 1943 in the amount of $71,511.60. Because of the provisions of the Current Tax Payment Act of 1943, the year 1942 is also involved. The petitioner claims an overpayment of income tax for the year 1943. Petitioner acquired all of the assets of Phoenix Mills, Inc., a New York corporation, in October 1942, and thereafter realized various amounts with respect to such assets. The questions for decision are: (1) Whether, in determining petitioner's gain upon sale of such assets, respondent erred in allocating petitioner's aggregate investment among the various assets involved. (2) Whether an agreement between petitioner and Beaunit Mills, Inc., dated October 28, 1942, effected a sale, rather than a lease, of certain machinery included among those assets. (3) Whether income realized by petitioner upon disposition of machinery and inventory included among the assets constituted ordinary income or capital gain. Findings of Fact The facts *222 stipulated are so found. Petitioner is now a resident of South Carolina; during 1942 and 1943 he resided in Statesville, North Carolina. His tax returns for 1942 and 1943 were filed, on the cash receipts and disbursements basis, with the collector of internal revenue for the district of North Carolina. For many years prior to November 1, 1942, petitioner was president and treasurer of Phoenix Mills, Inc. (hereinafter sometimes referred to as Phoenix), a New York corporation, located at Statesville, North Carolina. Phoenix had been engaged in the business of spinning yarn on a waste-woolen system and in the manufacture of a varied line of knitted products, both piece goods and outer garments, for several years prior to November 1, 1942. During the summer of 1942, its business outlook was uncertain. It had not been able to obtain any war contracts, and, inasmuch as its vendors required wartime priorities, it could not get the necessary raw materials to operate its mill. It occupied a rented factory under a lease which was to expire December 31, 1942. Although the lease contained an option to renew, the lessor was unwilling to execute a renewal of the lease for less than a five-year *223 period and the officials of Phoenix were hesitant to make any such commitment in view of the uncertainty of the textile market. Dr. E. G. Stillman of New York City and members of his family owned a large block of the outstanding stock of Phoenix. Petitioner owned 3,544.6247 shares of its stock, which had been acquired by him prior to May, 1940, for $128,986.40. During the summer of 1942, petitioner and Dr. Stillman held several conferences concerning the possibility of liquidating the business. They finally worked out a plan whereby petitioner would purchase all of the assets of the corporation, both tangible and intangible, at a price which would net the stockholders $20 per share for their stock. Petitioner discussed his proposed purchase of the assets of Phoenix with the president of The Wachovia Bank and Trust Company, Winston-Salem, North Carolina, and was told that the bank would help him to obtain the money needed to finance it. At a meeting of the stockholders of Phoenix held on October 8, 1942, they approved the sale of all of its assets to petitioner for $227,920. Phoenix ceased manufacturing operations on October 16, 1942. On October 20, 1942, the petitioner had a *224 conference with certain officers of the bank in which he advised them of the amount he desired to borrow and offered to give the bank as security for the loan all of the assets of Phoenix. Among the assets which petitioner was to acquire from Phoenix were machinery, petty cash and cash on deposit at various banks, inventories, samples and supplies, unearned premiums on insurance policies, accounts receivable, and a balance payable to Phoenix from C. A. Auffmordt and Company (hereinafter referred to as "Auffmordt"), Phoenix's factors in New York City. In a letter dated October 21, 1942, the bank advised petitioner that its loan committee had approved a loan to him of $227,920 to be secured by all of the property of Phoenix and to bear interest at the rate of 5 per cent. The letter contained the following statement: "We are handling this loan with the understanding as per our conversation that you will draw down in the next few days from factor in New York, C. A. Auffmordt and Company, 90% of credit balance standing with them, and which 90%, we understand, will approximate $165,000 which will be paid on your note immediately, the balance of the note to be liquidated from collection *225 of accounts receivable, sale of inventory, down payment on sale of machinery, etc. In other words, all the cash coming into your hands from any and all sources are to be applied toward the liquidation of the note." On October 22, 1942, Phoenix executed a bill of sale to petitioner wherein "in consideration of the sum of $227,920", it "conveyed, bargained, sold and delivered" to him all of its assets. In addition to the recited consideration petitioner assumed liabilities of Phoenix in the amount of $22,398.98. On the same day he executed a note payable to The Wachovia Bank and Trust Company for $227,920, wrote the bank officials that he planned to close the transaction on October 24, and asked that the proceeds of the note be placed in a trustee account he would open on October 24. On October 22 he also telephoned one of the partners of Auffmordt and asked that $150,000 of the balance shown on its books as payable to Phoenix be forwarded to Statesville, North Carolina. Three checks totaling $150,000, payable to Phoenix, were mailed by Auffmordt on October 22. On October 24, 1942, petitioner opened an account with The Wachovia Bank and Trust Company in the name of L. M. Graves, *226 Trustee, to receive the bank loan and any realization from the assets. The proceeds of the petitioner's note were deposited in this account on that day and a check in the amount of $227,920 was delivered to Phoenix. There were also deposited in this account on the same day deposits totaling $171,278.38, consisting of the three Auffmordt checks, bank account checks, and customers' checks, and a check for $150,000 was drawn against the account and credited on petitioner's loan. The assets of Phoenix were actually taken over by petitioner on October 24, 1942. The $227,920 received by Phoenix for its assets was distributed by it to its stockholders in the latter part of 1942, and petitioner received $70,892.50 for his Phoenix stock. Phoenix was dissolved in the early part of 1943. Prior to the sale of its assets, the operations of Phoenix at its plant at Statesville were divided into two divisions, one of which produced knitted garments and the other knitted piece goods. During the period November 7, 1941 to November 1, 1942, the invoices representing the sales of the piecegoods division were factored with Auffmordt. The sales made by the garments division were not factored. Auffmordt *227 has been engaged in business in the United States since 1839. On November 7, 1941, it entered into an agreement with Phoenix which provided as follows: "On our part we undertake as follows: "1. To advance to you 90% of your accounts receivable of sales of your merchandise less all trade and other discounts and commissions, provided such sales shall have been submitted and approved by us in writing, as to the customer's credit, and that invoices therefor with shipping documents shall have been delivered to us. "2. To be responsible for the payment of all such accounts, but such responsibility covers only the solvency of the purchaser and is effective only upon the unconditional acceptance of the merchandise. We reserve the right to cancel our approval and undertaking before delivery of the merchandise in case we consider the purchaser's solvency to have become impaired. "3. To render and collect in regular course of business, accounts of such sales as we shall have approved, and keep proper records of such collections. "4. To render monthly account sales made up as of the average due date plus ten days, and accounts current every six months as of May 31st and November 30th, *228 which accounts current shall become final and binding unless objection is made within thirty days from date of mailing to you. "On your part you undertake, in consideration of the foregoing, as follows: - "A. To assign to us all the accounts receivable or other proceeds resulting from your sales, whether now existing or hereafter arising, and you do hereby assign the same to us. "B. To deliver to us daily invoices for rendering to customers as soon as the goods are shipped, together with copies of such invoices, stamped and addressed envelopes, and original shipping documents of the merchandise, and also a daily list of your sales upon which there shall be placed an assignment in a form satisfactory to us, of the accounts listed; provided that if such an assignment of any account is not so given, this agreement shall be deemed such assignment. "C. To print upon each invoice rendered to customers a statement in red ink and in form satisfactory to us, to the effect that the account represented by such invoice is assigned to and payable to us only. "D. You shall submit to us for our approval all proposed sales before delivery of the merchandise and our credit responsibility *229 applies only to sales so submitted and approved by us in writing. "E. In case any invoice or account is paid direct to you, you shall receive such payment as our agents only, and turn over the same forthwith to us in the identical form in which the same is received and you hereby authorize us to sign your name to such endorsement as may be necessary to collect the same. "F. To make daily reports to us of all credits, allowances and returns of merchandise with the reason therefor. "G. Accounts not paid at maturity for any reason, except the insolvency of the purchasers or the purchasers' inability to pay where we take the credit risk, shall be charged back to you in our accounts, and you shall hold us harmless from any costs or expenses in connection therewith or with the collection thereof, and if you shall thereafter collect any sums on such accounts, you shall turn over such collections to us and receive credit therefor. "H. In case any merchandise, upon the sale of which you shall have received the advance above provided for, is rejected by the purchaser, you shall immediately report the same to us in writing, whereupon the amount advanced thereon shall be charged back to *230 you on our account, and upon the merchandise so rejected coming into your possession, the same shall, if requested by us, be set apart from other stock in your possession and is hereby pledged to us as further security for our advances, and shall be held by you as our agents and subject to our order, and you shall be liable for the repayment of such advance. "J. This contract contemplates only sales of your knitted piece goods, but in case other sales are discounted by us all the provisions of this agreement shall apply to such sales. "Both parties agree as follows: "I. Interest at the rate of Six (6%) Per Cent per annum shall be charged pro and con. "II. In case at any time, by reason of returns of merchandise or otherwise, the agreed percentage of our advance shall be exceeded, you shall assign other accounts receivable as the same shall come into existence without being entitled to advance thereon, until such excess has been made up. "III. You agree to pay us and we shall be entitled to charge in our accounts a commission of One and a Half (1 1//2%) Per Cent upon the net amount of your sales as compensation for all services rendered to you by us hereunder. "IV. This *231 agreement shall commence on the First day of December, 1941 and shall continue until terminated by either party hereto upon fifteen (15) days notice in writing to the other. "V. Upon the termination of this agreement we may withhold sufficient funds to cover us against eventual merchandise claims, and a final accounting shall be rendered as soon as practicable thereafter. "VI. This agreement is made in the State of New York and is to be construed and governed by the laws of said State." The purpose of factoring is to make available to mills a ready flow of cash through the discounting of their accounts receivable. In the case of Phoenix, it would submit orders to the credit department of the factor for the factor's approval. When approval was given, the merchandise was manufactured and shipped and the customers were invoiced. The invoices bore a statement to the effect that the net amount of the invoice was assigned and payable to Auffmordt. At the same time, a copy of the invoice was mailed to Auffmordt and, when it was received by the latter, Phoenix was credited with the net amount of the invoice. These credits accumulated into a balance against which Phoenix drew money as *232 the occasion arose for use in the operation of its business. On October 22, 1942, the credit balance of Phoenix on the books of Auffmordt was approximately $186,000. Of this amount $130,000 was not yet due under the terms of sale, plus the ten days which Auffmordt had for accounting purposes, and under the provisions of paragraph 1 of the factoring agreement 10 per cent of $13,000 could not be withdrawn. The remaining $56,000 was past due and available in its entirety to Phoenix on demand and subject to its order. During the entire time Phoenix did business with Auffmordt it made frequent withdrawals on its account, which withdrawals were made by telephone call, telegram or letter. On December 30, 1942, petitioner received from this account $19,103.87; on January 14, 1943, $15,000; and on February 3, 1943, the balance remaining in the account, $2,299.50. Among the assets which petitioner purchased from Phoenix were certain machinery and equipment located at Statesville, North Carolina. They consisted of twelve sets of cards and supplementary spinning machines, or mules, a large number of knitting machines and sewing machines and various auxiliary finishing equipment. The spinning *233 machinery was old, some having been built in 1907, but it was in usable condition. There were some modern knitting machines which were in demand but on which there was an O.P.A. ceiling price of $1,400 on each machine. The sewing machines, mostly quite old, were of coarse gauge and adapted to a limited use. In October 1942, there was a market for these types of machines. On October 8, 1942, prior to his acquisition of the above-mentioned machinery, petitioner aproached Beaunit Mills, Inc., of New York City, in regard to the purchase by it of the machinery and equipment which he intended to acquire from Phoenix. On October 28, 1942, petitioner entered into an agreement with Beaunit Mills, Inc., pursuant to which he agreed to "lease and demise" unto Beaunit Mills, Inc., the machinery and equipment which he had purchased from Phoenix for a stated term of eight months commencing November 1, 1942, and ending June 30, 1943, at a stated "rental" of $20,000, together with an "option" to purchase said machinery and equipment between June 1, 1943 and June 30, 1943, for $82,000. On November 1, 1942, Beaunit Mills, Inc. organized a wholly owned subsidiary, Phoenix Mills, Inc. under the laws *234 of the State of Delaware. Beaunit Mills, Inc. assigned all of its right, title and interest in the agreement of October 28, 1942 to the new corporation, and on November 2, 1942 the latter paid petitioner $10,000 "as rent" and on January 21, 1943, it paid him a second $10,000 "as rent". The building occupied by Phoenix Mills, Inc. (Delaware) was the same building occupied previously by Phoenix Mills, Inc. (New York) and the machinery formerly owned by the latter corporation remained in that building at Statesville, North Carolina, until part of it was sold by Phoenix Mills, Inc. (Delaware). Phoenix Mills, Inc. (Delaware), prior to June 1, 1943, made the following sales of a part of the machinery acquired from the petitioner under the agreement of October 28, 1942: November 28, 1942
$ 8,638.75
January 2, 1943
13,603.50
January 2, 1943
75.00
January 30, 1943
832.00
February 27, 1943
1,250.00
March 31, 1943
794.00
May 1, 1943
145.00
May 29, 1943
150.00 Although petitioner knew of these sales, he did not object to them or to the removal of the machinery sold from the building at Statesville. By letter dated June 24, 1943, Phoenix Mills, Inc. (Delaware), *235 acting through its attorneys, purported to exercise the "option" contained in the agreement of October 28, 1942, and simultaneously paid $22,000 to petitioner. The remaining $60,000 was paid on December 3, 1943. On July 8, 1943. petitioner executed a bill of sale in which he purported to sell to Phoenix Mills, Inc. (Delaware), the same machinery that was the subject of the "lease" and "option" agreement of October 28, 1942. The "lease" and "option" agreement of October 28, 1942, did not reflect the true arrangement between the parties, which was in fact a sale consummated on October 28, 1942 at a price of $102,000 that was subsequently paid. Included in the assets which petitioner had purchased from Phoenix were miscellaneous items of personal property formerly held by Phoenix as "inventory, supplies and miscellaneous". Petitioner returned some of these items to the original vendors, who credited petitioner with the amounts applicable thereto, and he sold the remaining items during 1942 and 1943. The items returned for credit aggregated $3,310.62. The transactions dealing with the items denominated as "inventory" are reflected in the following schedule: Date
Name
Amount
10-29-42
Dr. E. G. Stillman (all sweaters in mill)
$ 2,475.95
11- 4-42
Atlas Converting Co. (less used for sweater fronts)
150.00
11- 7-42
Frank Double (entire inv. of unfav. knitting yarns all colors &grades)
9,687.99
11-18-42
Edward T. Leonard (1018# wor. yarn returned)
1,613.55
11-20-42
Ness Bros. & Co. (misc. lot rags, bale covers, etc.)
305.52
11-20-42
Beaunit Mills, Inc. (N. Y.)
816.99
11-23-42
Textile Sales Co. (4 cases bindings & ribbon)
400.00
11-25-42
Atlas Waste Mfg. Co., Inc. (return to orig. vendor)
385.62
11-25-42
Fairplay Knitting Mills (buttons)
178.40
11-25-42
Edward T. Leonard (yarn returned)
837.00
11-30-42
Fred Whitaker Co. (rayon returned)
67.00
11-30-42
Fanjoy & Bowles Chair Co. (odd lot of cartons)
68.25
12- 3-42
Beaunit Mills, Inc. (10 bales wool waste)
1,179.05
12- 3-42
Marlow Van Loan Corp. (empty carboys returned)
15.00
12- 4-42
Beaunit Mills, Inc. (1 case cotton yarn - 2 bales rayon)
429.45
12- 7-42
O. H. Dugan & Co. (buttons ret'd orig. vendor)
382.45
12- 8-42
Beaunit Mills, Inc. (1 case cotton yarn)
152.10
12-14-42
Phoenix Mills, Inc. (1 bale rayon)
183.52
12-16-42
The Button Machinery Co. (157 gr. buttons)
209.80
12-18-42
Hanover Glove Co., Inc. (4 rolls odd cloth)
72.37
12-28-42
Standard Oil Co. (steel drum returned)
10.00
12-29-42
Phoenix Mills, Inc. (1 bale wool waste)
320.17
Miscellaneous - net
174.56
1942 TOTAL
$20,114.74
5-17-43
Beaunit Mills, Inc. (Cotton Yarn)
$38,997.05
5-24-43
Atlas Waste Manufacturing Co. (Raw Stock)
20,000.00
5-28-43
Beaunit Mills, Inc. (Cotton Yarn)
2,162.00
1943 TOTAL
$61,159.05
*236 In addition to the foregoing, the petitioner sold a small amount of miscellaneous items, such as samples and odd garments. The Commissioner determined that he received $402.94 in 1942 and $32.37 in 1943 with respect to these items. Prior to the purchase of the machinery, inventory, and miscellaneous items of personal property, the petitioner had never bought or sold similar items on his own behalf. He did not advertise them for sale. The sales of these items were made in the office of the corporation at Statesville, and, in general, were not the result of any solicitation by petitioner. He did ask a salesman of the Waste Manufacturing Company to make an offer for the raw stock sold to that company in 1943. He negotiated directly the sales made to Beaunit Mills and Phoenix Mills, Inc. (Delaware). The transactions involving the disposition of the inventory items in 1942, with the exception of sales made to Beaunit Mills and Phoenix Mills, Inc. (Delaware), were handled for petitioner by an accountant employed by the latter corporation as an accommodation to petitioner. The machinery, inventory, and miscellaneous items of personal property sold by petitioner were not held by him primarily *237 for sale to customers in the ordinary course of his trade or business. Included in the assets which petitioner purchased from Phoenix were accounts receivable amounting to $94,736.77, which had not been the subject of any factoring agreement with Auffmordt. Petitioner collected the amounts due as they matured. Among the assets petitioner acquired from Phoenix were certain casualty insurance policies which had a cash value in the unearned insurance premium. In February 1943, petitioner assigned these policies to Phoenix Mills, Inc. (Delaware) and received therefor the amount of $1,018.42. Petitioner also acquired from Phoenix cash and bank deposits which he promptly converted to cash in the amount of $18,614.14. In determining the deficiencies, the respondent determined that petitioner realized no gain or loss on the sale of the insurance policies or by reason of the acquisition of the cash and bank deposits. On November 1, 1942, the petitioner entered the employ of Phoenix Mills, Inc. (Delaware) at Statesville, North Carolina. He did not become a stockholder of this corporation. Although he was given the title of "Treasurer", his chief duty was to keep the mill supplied with *238 raw materials for the spinning department. He devoted his full time to the duties assigned to him. In 1943, petitioner sold for $2,700, two hundred shares of capital stock of the Irving Trust Company, which stock had a cost basis to him of $2,832. The expense of the sale amounted to $39.01. Petitioner owned this stock less than six months and sustained a short-term capital loss of $171.01. The respondent determined the amount realized by the petitioner from the sale or other disposition of the assets he purchased from Phoenix, and allocated petitioner's total cost of these assets, $250,318.98 ($227,920 plus assumption of liabilities in amount of $22,398.98), as follows: Amount realized
1942
1943
Total
Cost
Cash
$ 18,614.14
$ 18,614.14
$ 18,614.14
Insurance policies
$ 1,018.42
1,018.42
1,018.42
Accounts Receivable
93,243.97
1,492.80
94,736.77
47,016.23
Auffmordt Account
186,382.70
186,382.70
92,498.53
Inventories
20,114.74
61,159.05
81,273.79
40,334.83
Machinery
10,000.00
92,000.00
102,000.00
50,620.91
Samples and Supplies
402.94
32.37
435.31
215.92
Dividend, American Mutual Ins. Co.
308.46
308.46
$484,769.58
$250,318.98
*239 The respondent determined the cost basis of assets other than cash and insurance policies by deducting the amount of these two items from the total cost and allocating the remainder over the remaining assets in proportion to the amount subsequently received therefor. Opinion RAUM, Judge: 1. Petitioner paid $250,318.98 [1] for all of the assets of Phoenix, on which he realized an aggregate of approximately $484,000 during the years involved. It becomes necessary to allocate petitioner's cost among the various assets in order to determine the profit to be attributed to the sales or other disposition of such assets. The Commissioner proceeded upon the assumption that where consideration is paid for a mixed group of assets a cost basis is to be allocated to each asset based upon its relative value to the whole at the time of acquisition. Cf. Nathan Blum, 5 T.C. 702; C. D. Johnson Lumber Corporation, 12 T.C. 348. And the Commissioner used the prices at which the various assets were actually sold in determining their value. We accept the method employed by the Commissioner, and in the absence of more satisfactory evidence of value, we approve the use of the *240 amounts actually realized as the measure of value of the various assets involved. [2]
In applying the foregoing method, the parties are in agreement that petitioner's cost must first be applied in full to any cash or to any asset that is substantially the equivalent of cash, such as bank deposits or cash surrender value of insurance policies, and that it is only the remainder which is to be allocated among the other assets in proportion to their respective values. Thus, the Commissioner allocated $18,614.14 to cash and bank deposits, and $1,018.42 to insurance policies, and then proceeded to allocate the remaining cost among the other assets. The principal point of difference between the parties relates *241 to the treatment of the balance in the Auffmordt account. Petitioner contends that this asset was substantially the equivalent of cash, and should have been treated as such along with the bank deposits and insurance policies. We agree with petitioner in part. Of the balance of some $186,000 in the Auffmordt account, petitioner was able to and in fact did draw $150,000 simultaneously withthe purchase of the assets. Indeed, the $227,920 bank loan which enabled petitioner to purchase the assets was made with the understanding that a substantial withdrawal would be made simultaneously on the Auffmordt account and applied at once towards the repayment of the loan. We have examined the factoring contract here involved and the practice thereunder, as disclosed in this record, and are satisfied that to the extent of the $150,000 withdrawal, petitioner acquired the substantial equivalent of cash in purchasing the assets of Phoenix and that it should be treated in the same manner as the bank deposits and insurance policies. However, we do not agree with petitioner that like treatment should be accorded to the balance of the Auffmordt account of some $36,000. Paragraph 1 of the factoring *242 contract limited withdrawals to 90 per cent of the accounts receivable, [3] and paragraph V provided that upon termination of the agreement Auffmordt could withhold sufficient funds to cover it against merchandise claims. Petitioner testified that when the $150,000 was withdrawn he was told by a member of the Auffmordt firm that "when they wound up with the mill for which they were factoring they withheld more than they otherwise would". When he was making arrangements for the $227,920 loan, he told the bank officials that the Auffmordt balance would be immediately available and the bank approved the loan with the understanding that he would draw down 90 per cent of the Auffmordt balance, or approximately $165,000, and immediately apply it on his note. Only $150,000 was withdrawn and applied on the note. Although petitioner testified that $150,000 was withdrawn because that was all he needed, we are satisfied that he would have withdrawn more if the balance had been unqualifiedly subject to his demand. The withdrawal of only $150,000, coupled with the restrictive provisions of paragraphs 1 and V and other evidence set forth above, seems to us to require the conclusion that the balance *243 of some $36,000, in allocating cost to the assets of Phoenix purchased by petitioner, should be treated as an ordinary account receivable, and not as cash or the equivalent of cash. We so hold. Among the assets received by petitioner were items of inventory and supplies. Some of these items were returned to the original vendors for credit and the remainder sold to others. For the former the petitioner received $3,310.62, and he urges that this amount should be treated as cash or its equivalent for purposes of cost allocation. We have no reason to believe, on this record, that petitioner was entitled to return these items to the vendors, or that they would honor such returns. Until these items were returned and petitioner was paid for them, they were not the equivalent of cash and may not be treated as being in a different category from merchandise sold to others. Accordingly, we conclude that in making the allocation of petitioner's cost among the various assets received, $169,632.56 (consisting of $18,614.14 cash and bank deposits, $1,018.42 insurance policies, and $150,000 withdrawal on Auffmordt *244 account) is to be charged against petitioner's cost of $250,318.98, thereby leaving a cost basis of $80,686.42 to be allocated among the remaining assets. 2. A dispute exists between the parties as to the proper treatment to be accorded to petitioner's disposition of machinery acquired from Phoenix. On October 28, 1942, petitioner and Beaunit Mills, Inc., purported to enter into an agreement whereby petitioner leased the machinery to Beaunit for $20,000 to June 30, 1943, and gave it an option (exercisable in June 1943) to purchase the machinery for $82,000. Beaunit promptly assigned its interest in the agreement to its wholly owned subsidiary on November 1, 1942. The so-called rental of $20,000 was paid to petitioner in two installments shortly thereafter, and the subsidiary, in June 1943, purported to exercise the option, paying the $82,000 in several installments, as permitted by the agreement. Petitioner insists that this transaction was simply one of a lease, in which he is to report $20,000 as rent, and a sale in June 1943 at a price of $82,000. The Government, on the other hand, contends in substance that there was no real lease at all and that the arrangement was merely a *245 sale for $102,000 that was effected at once on October 28, 1942. If the agreement of October 28, 1942, is taken at face, it is clear that petitioner would prevail on this issue. But we are satisfied, on the evidence, that the written agreement of October 28, 1942, does not reflect the true arrangement between the parties. We are convinced that petitioner and Beaunit intended to and did enter into a purchase and sale arrangement for an aggregate consideration of $102,000 whereby petitioner transferred title to Beaunit at once, and that the written agreement was intended to camouflage the true situation. During the period November 28, 1942, to May 29, 1943, when the machinery was supposed to have been under lease, Beaunit's subsidiary made eight separate sales of portions of the very machinery involved, and received an aggregate of approximately $25,400 on such sales. Petitioner was then an officer of the subsidiary; he knew of these sales and did not object to them. No credible explanation was offered at the trial as to why petitioner failed to object to these sales, if he knew that the machinery involved really belonged to him, and had merely been leased by him. Moreover, the so-called *246 $20,000 rental for a comparatively brief period seems wholly disproportionate in the light of the alleged sales price of $82,000 for all of the machinery. Taking all the facts into account, as they appear in this record, we think that petitioner has failed to overcome the presumptive correctness of the Commissioner's determination, and we are satisfied that petitioner actually sold the machinery to Beaunit on October 28, 1942, for a total price of $102,000. The respondent treated the sale of machinery as a sale on the installment basis and allocated a portion of the profit realized by petitioner to the payment received in 1942 and to the payments received in 1943. The petitioner urges that, since it has not elected to use the installment method of reporting this income, the respondent cannot force him to do so. We agree. Cf. Truman Bowen, 12 T.C. 446, 467. 3. The final issue is whether petitioner is entitled to the benefit of the capital gains provisions with respect to the profit realized on the sale of the machinery and inventory. The Commissioner, in determining that such profit represented ordinary income, relied upon Section 117 (a) (1) (A) of the Internal Revenue Code *247 , which provides the term "'capital assets' * * * does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The issue is predominantly a factual one (cf. W. T. Thrift, Sr., 15 T.C. 366, 369), and we are satisfied that the machinery and inventory here involved were not held by petitioner "primarily for sale to customers in the ordinary course of his trade or business". He did not deal in machinery or goods of the type that he acquired from Phoenix. His business was that of a full-time officer of the corporation which employed him. Nor did he engage in the business of selling machinery and textile goods as a side line. What we have here is a single transaction in which petitioner made an unusually advantageous purchase and sought to liquidate it promptly. He did not advertise; he did not have selling agents. Such selling assistance as was afforded him was merely in the nature of an accommodation by someone in the office of Phoenix's successor. He disposed of the bulk of the machinery and merchandise, dollar-wise, to comparatively few purchasers. The persons or organizations that purchased the *248 machinery and goods from him could hardly be called his "customers". We conclude that the provisions of Section 117 (a) (1) (A), relied upon by the Commissioner, are inapplicable. Decision will be entered under Rule 50. Footnotes
1. Of this amount, $227,920 was paid by check on October 24, 1942, when petitioner acquired the assets, and the remaining $22,398.98 was paid through the assumption of liabilities of Phoenix. ↩
2. Petitioner urges that the value of the machinery and inventory of goods which he purchased from Phoenix was "zero," and so testified at the trial. In view of the substantial amounts realized on the machinery and inventory shortly thereafter. We cannot give much weight to such testimony.↩
3. The amount that could not be withdrawn by reason of paragraph 1 was $13,000.↩